IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 17, 2014

**IN RE: JOSEPHINE E. M. C.**

**Direct Appeal from the Juvenile Court for Sevier County**
**No. 13-000005     Jeffrey D. Rader, Judge**

**No. E2013-02040-COA-R3-PT-FILED-APRIL 17, 2014**

This appeal involves the termination of a mother's parental rights to her young daughter. The trial court terminated the mother's parental rights based upon four separate grounds: substantial noncompliance with a permanency plan; abandonment by willful failure to visit; abandonment by failure to provide a suitable home; and persistent conditions. We find that DCS failed to prove by clear and convincing evidence that it made reasonable efforts to reunify the mother and her child, and we reverse the trial court's finding that grounds for termination were proven by clear and convincing evidence. This matter is remanded for such further proceedings as may be necessary.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Rolfe A. Straussfogel, Knoxville, Tennessee, for the appellant, J. C.

Robert E. Cooper, Jr., Attorney General and Reporter, Martha A. Campbell, Deputy Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee Department of Children's Services

Robert L. Huddleston, Maryville, Tennessee, Guardian *Ad Litem* for Josephine E. M. C.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Josephine E.M.C. was born out-of-wedlock to Mother and Father on July , 2011. On April 26, 2012, the Tennessee Department of Children's Services ("DCS") received a referral alleging that nine-month-old Josephine was improperly supervised due to the fact that her custodian, Mother, was intoxicated and had been arrested, and the child was at the Gatlinburg police station. Josephine was taken into the protective custody of DCS at approximately 1:00 a.m.

The next day, on April 27, 2012, DCS filed a petition in the juvenile court of Sevier County seeking temporary legal custody of Josephine and asking the court to declare her dependent and neglected. The petition alleged that Mother had been arrested and charged with child neglect.[1] According to the petition, the DCS case manager who arrived at the police station interviewed Mother and learned that she and Josephine's father had a history of domestic violence. The case manager also reported that Mother "had slurred speech and appeared somewhat incoherent" during the interview. Thus, the petition alleged that there was no less drastic alternative than removing Josephine from Mother's care pending a preliminary hearing.[2] The juvenile court issued a protective custody order awarding temporary legal custody of Josephine to DCS, and Josephine was placed in the home of a foster family.

A preliminary hearing was held on May 9, 2012. The juvenile court found that it was contrary to the child's best interest to remain in the custody of her parents and that there was no less drastic alternative to removal. Specifically, the court found that Mother and Father "have a history of domestic violence which is continuing" and that Mother "has admitted

---

[1] According to the affidavit of complaint with regard to Mother's arrest for child neglect, she and Josephine were found in a motel room with numerous other intoxicated adults, and according to the responding officer, it "was very clear that the mother had intentionally bec[o]me intoxicated while caring for her baby and could no longer maintain the baby's safety, health, and welfare." Mother eventually pled guilty to misdemeanor child neglect and was placed on probation.

[2] The petition for temporary custody filed by DCS alleged that Josephine's father had multiple outstanding warrants in Georgia, that he had recently been charged with DUI, possession of stolen property, leaving the scene of an accident, reckless driving, and "no insurance" in connection with a car accident in Pigeon Forge, Tennessee, and that after a meeting with DCS following Mother's arrest, he submitted to a drug test which was positive for marijuana.

Josephine's father's parental rights were terminated during these proceedings but he did not appeal the order of termination. Therefore, we will only discuss Father's involvement in this case to the extent that it provides background information or as it relates to Mother's circumstances.

ongoing substance abuse." Thus, the court ruled that Josephine would remain in the custody of DCS pending an adjudicatory hearing. The court ordered Mother to pay $100 per month in child support for Josephine beginning on June 9, 2012. The court also explained to Mother the definitions of abandonment for failure to visit and failure to support and how those terms relate to the termination of parental rights. The court ordered Mother to complete an alcohol and drug assessment and to submit to random drug screens. Mother was given a drug screen that day, and she tested positive for THC. She apparently "admitted she would test positive" when faced with another test on May 17, 2012.

A permanency plan was developed for Josephine on May 22, 2012. The plan stated its goals as "Return to Parent" or "Exit Custody with Relative," and it set a goal target date of October 26, 2012. According to the plan, the conditions that prevented Josephine from exiting state custody were the unresolved criminal charges involving both parents, the unresolved alcohol and drug issues involving both parents, and the Department's concerns regarding the history of domestic violence between the parents. The permanency plan required Mother to resolve her criminal charge of child neglect and to avoid any new charges. It required Mother to attend an alcohol and drug assessment, to honestly report her history of illicit drug use, and to follow all recommendations of the assessment. It also required her to attend Alcoholics Anonymous meetings to maintain her sobriety, and to provide proof of her attendance to DCS. The plan listed as one of Mother's strengths that she "admits she has issues with alcohol" and that she was reportedly trying to get into an alcohol and drug treatment program. The plan required Mother to submit to random drug screens at DCS's request. In order to address the issue of domestic violence, the permanency plan required Mother to attend non-offender domestic assault classes to completion.

Due to the Department's concern that Mother had not demonstrated safe supervision of Josephine in the past, as evidenced by her alcohol consumption, the permanency plan also required Mother to attend parenting classes and to demonstrate safe and appropriate parenting techniques during supervised visits with Josephine. The plan provided that Mother would visit with Josephine every other Thursday for two hours at the DCS office and that she would provide diapers, wipes, a snack and drink, and age-appropriate toys for Josephine during these visits. It required DCS to assist the parents with transportation to and from visits when needed.

The permanency plan also noted the Department's concern with Mother's instability regarding her employment and her housing situation. The plan noted that both Mother and Father were currently living in motel rooms. According to the plan, they also had limited access to transportation, as evidenced by their late arrival at court hearings and their self-reported transportation issues preventing their attendance at child and family team meetings. Consequently, the permanency plan required them to submit proof of legal income to DCS

on a monthly basis, to provide proof of housing appropriate to suit the family's needs, and to show an ability to access reliable transportation, to be evidenced by their attendance at scheduled appointments, court hearings, and employment responsibilities.

Mother did not attend the meeting at which the permanency plan was developed, but she signed the permanency plan during a visit with Josephine on May 31, 2012, acknowledging that she was in agreement with the plan and had been provided with a copy. Mother also signed a document explaining the criteria for termination of her parental rights. That same day, Mother took another drug screen and again tested positive for THC. Mother tested positive for THC on yet another drug screen on June 14, 2012. She regularly attended supervised visits with Josephine as scheduled during this time.

On June 27, 2012, the juvenile court held an adjudicatory hearing and found by clear and convincing evidence that Josephine was dependent and neglected. Mother did not appear at the hearing but she was represented by her appointed counsel. The juvenile court heard testimony from DCS representatives and from law enforcement officers. The court found that Mother and Father "have a history of domestic violence which has spanned the entirety of their romantic relationship" and that they "have had incidents of violence up to and even after this child was removed into DCS' custody." In addition, the court found that Mother "has a history of substance abuse – namely, alcohol, which renders her unable to provide adequate care for her child at this time." Therefore, the court concluded that it was in Josephine's best interest to remain in the custody of DCS. The juvenile court also entered an order ratifying the permanency plan that same day.

On August 19, 2012, Mother filed a petition for an order of protection against Father, alleging that he had, on July 31, 2012, given her a black eye and a broken eye socket and raped her twice "while [she] was bleeding from [her] broken face." She also alleged that Father had "pulled & drug [her] out of [a] car" and "tazed [her] over seven times in a month." However, Mother did not show up for the court date or otherwise pursue the order of protection, so the petition was dismissed. Father eventually pled guilty to domestic assault with bodily injury.

On October 22, 2012, a revised permanency plan was developed for Josephine. The plan maintained the original goal of "Return to Parent" or "Exit Custody with Relative," but it extended the original goal target date of October 26, 2012, to April 22, 2013, which would mark approximately one year that Josephine had been in DCS custody. Like the original plan, the revised plan stated that the conditions preventing Josephine from exiting state custody included the parents' unresolved criminal charges, unresolved alcohol and drug issues, and history of domestic violence. The revised plan noted that Mother was still on probation due to the charge of child neglect, but it stated that Mother had been compliant

-4-

with the requirements of her probation. It required her to resolve her legal charges, to avoid incurring any new charges, and to complete the requirements of her probation.

The revised plan stated that Mother had completed an alcohol and drug assessment, and it required her to follow all recommendations of the assessment by scheduling an intake appointment for intensive outpatient treatment and medication management by November 1, 2012. The plan required Mother to apply for TennCare by November 1 as well, and to submit the recommendations from her alcohol and drug and mental health assessments for a determination of eligibility. According to the plan, Mother agreed to attend AA meetings and to provide proof of her attendance to DCS. The revised plan noted Mother's past drug screens that were positive for THC, and it stated that despite these tests, Mother had "continually denied use" to DCS. Thus, the revised plan required Mother to continue to submit to random drug screens.

Regarding domestic violence, the revised plan stated that Mother had been referred to "Safe Space" for domestic violence support. The plan required Mother to work with Safe Space to learn appropriate conflict resolution and how to keep herself safe in relationships. The plan noted that Father had chased Mother with a taser during one altercation since Josephine had been in DCS custody, and that Mother had sought an order of protection. It also noted that Father had pled guilty to domestic assault with bodily injury, for which he was currently on probation.

The revised plan stated that Mother was participating in parenting classes, and it required her to complete those courses and to demonstrate appropriate parenting skills during her visits with Josephine. The revised plan required Mother to continue visiting Josephine every other Thursday at the DCS office. It noted that she had missed her last two visits due to employment issues.

The revised plan listed continued concerns with Mother's instability regarding her housing, employment, and transportation. It listed as one of Mother's "strengths" that she was employed and working two jobs – one at a gas station and the other at a cabin rental agency. However, the plan noted that Mother was still living in hotel rooms and reporting transportation issues. The plan required Mother to submit proof of income to DCS on a monthly basis, to demonstrate an ability to access reliable transportation, and to provide proof of housing appropriate to meet family needs. The plan also noted that Mother had no health insurance and that she was not paying any child support, despite being ordered to do so some four months earlier. Mother signed the revised permanency plan, indicating that she participated in its development and agreed with its provisions, and the plan was ultimately approved by the juvenile court.

The juvenile court entered a dispositional order in the dependency and neglect proceedings on October 24, 2012, holding that Josephine was dependent and neglected within the meaning of the law and that temporary custody should remain with DCS.[3] Father moved to Florida in November 2012, but at some point he apparently moved back to Georgia, where Josephine had been born. In late December 2012, Mother also moved back to Georgia to be near her family.

On January 2, 2013, DCS filed a petition in the juvenile court of Sevier County to terminate the parental rights of Mother and Father. The petition stated that Josephine had been in foster care since April 26, 2012, and that she had been adjudicated dependent and neglected. The petition alleged four grounds for termination. First, it alleged abandonment by willful failure to support due to the fact that Mother had not provided child support for Josephine despite being ordered to pay $100 per month beginning in June 2012. Tenn. Code Ann. § 36-1-113(g)(1); 36-1-102(1)(A)(i). Second, the petition alleged abandonment for failure to provide a suitable home, specifically alleging that Mother had made no reasonable effort to provide a suitable home for Josephine since she was removed from Mother's care, in spite of reasonable efforts by DCS to assist her in establishing a suitable home. Tenn. Code Ann. § 36-1-113(g)(1); 36-1-102(1)(A)(ii). Next, the petition alleged that termination was proper due to Mother's substantial noncompliance with the permanency plans. Tenn. Code Ann. § 36-1-113(g)(2). Finally, the petition alleged the existence of persistent conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that prevented the child's safe return to Mother's care. Tenn. Code Ann. § 36-1-113(g)(3). The petition asserted that it was in Josephine's best interest to terminate Mother's parental rights. The juvenile court appointed a guardian ad litem for Josephine, and it appointed counsel for Mother and for Father upon determining that they were indigent.

The petition was heard on July 2, 2013, which happened to be Josephine's second birthday. The court heard testimony from DCS case manager Carol Davis, from CASA volunteer Nancy Rickenbach, from Josephine's foster father, and from Mother. On August 14, 2013, the trial court entered an order terminating the parental rights of Mother and Father, finding by clear and convincing evidence that all four grounds for termination had been proven and that it was in Josephine's best interest for termination to occur. Mother timely

---

[3] There are two phases to a dependency and neglect proceeding: "the adjudicatory phase in which the court determines whether a child is dependent and neglected pursuant to Tenn. Code Ann. § 37-1-129(a)(1), and the dispositional phase where the court 'proceed[s] immediately or at a postponed hearing to make a proper disposition of the case' under Tenn. Code Ann. § 37-1-129(c)." *In re Alysia M.S.*, No. M2011-02008-COA-R3-JV, 2013 WL 1501710, at *5 (Tenn. Ct. App. Apr. 11, 2013). "Making a 'proper disposition' requires the court to make a custody determination 'best suited to the protection and physical, mental and moral welfare of the child.'" *Id.* (citing Tenn. Code Ann. § 37-1-130(a)).

filed a notice of appeal to this Court.

## II.  ISSUES PRESENTED

Mother presents the following issues, slightly restated, for review on appeal:

1.  Whether the evidence at trial clearly and convincingly established grounds for termination of Mother's parental rights;
2.  Whether the evidence at trial showed that DCS failed to make reasonable efforts to reunify Mother and the child; and
3.  Whether the evidence at trial clearly and convincingly established that termination of Mother's parental rights was in the best interest of the child.

For the following reasons, we reverse the order of the juvenile court and we remand this matter for further proceedings as may be necessary.

## III.  STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are also governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. In light of the constitutional dimension of the rights at stake in a termination proceeding, the person seeking to terminate

these rights must prove all the elements of the case by clear and convincing evidence. ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)).  In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. ***In re Adoption of Angela E.***, 402 S.W.3d 636, 639 (Tenn. 2013); ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006).  Clear and convincing evidence has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***Id.*** at 640 (citing *In re Valentine*, 79 S.W.3d at 546).  It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. ***In re Audrey S.***, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). ***In re Audrey S.***, 182 S.W.3d at 861.  First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. ***In re Adoption of Angela E.***, 402 S.W.3d at 639.  Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) amount to clear and convincing evidence that one of the statutory grounds for termination exists. ***Id.*** at 639-40.  Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. ***In re R.L.F.***, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV.   DISCUSSION

### *A.   Substantial Noncompliance*

One of the grounds for termination asserted in this case is substantial noncompliance with a permanency plan, pursuant to Tennessee Code Annotated section 36-1-113(g)(2).  Specifically, the statute provides that grounds for termination exist if "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2).  As clearly stated in the statute, in order for a parent's noncompliance to justify the termination of parental rights, it must be "substantial." ***In re Angel S.F.***, No. M2012-02089-COA-R3-PT, 2013 WL 1136551, at *5 (Tenn. Ct. App. Mar. 18, 2013) (citing *In re S.H.*, No. M2007–01718–COA–R3–PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008)).  Terminating parental rights based on this ground "requires more proof than that a parent has not complied with every jot and tittle

of the permanency plan." ***In re M.J.B.***, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Rather, "[t]o succeed under Tenn. Code Ann. § 36–1–113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." ***Id.*** (citations omitted). "Substantial" means "of real worth and importance." ***In re Valentine***, 79 S.W.3d at 548 (quoting *Black's Law Dictionary* 1428 (6th ed. 1990)). "'Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.'" ***In re Abigail F.K.***, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App. W.S. Sept. 14, 2012) (quoting *In re K.E.R.*, No. M2006-00255-COA-R3-PT, 2006 WL 2252746, at *5 (Tenn. Ct. App. Aug. 3, 2006)). Additionally, a parent's "improvement toward compliance should be considered in a parent's favor." ***In re Valentine***, 79 S.W.3d at 549 (citing *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)).

In response to DCS's contention about Mother's lack of effort, Mother asserts that it was DCS that failed to make reasonable efforts to reunify her with Josephine. Under certain circumstances, DCS has a statutory obligation to use "reasonable efforts" to preserve, repair, and restore a parent-child relationship when DCS intervenes in family matters. ***In re Bernard T.***, 319 S.W.3d 586, 599-600 (Tenn. 2010). "Because of the importance of family relationships, the Tennessee General Assembly has recognized that children should not be separated from their parents unless the separation is necessary for the children's welfare or is in the interests of public safety." ***Id.*** at 600 (citing Tenn. Code Ann. § 37-1-101(a)(3); Tenn. Code Ann. § 37-2-401(a)). Thus, when circumstances do require that children be separated from their parents, DCS may be required to "use reasonable efforts to make it 'possible for the child to return safely to the child's home.'" ***Id.*** (citing Tenn. Code Ann. § 37-1-166(a)(2), (g)(2)). In addition, when DCS commences a parental termination proceeding, "it may be required to demonstrate that it has used reasonable efforts to reunify the family before a court will grant its termination petition." ***Id.***

To be clear, DCS is not required to use reasonable efforts to reunite a parent with his or her child every time it removes a child from a parent's custody. ***In re Bernard T.***, 319 S.W.3d at 600. For example, reasonable efforts are not required "if a court of competent jurisdiction has determined that" certain statutorily defined "aggravated circumstances" exist. Tenn. Code Ann. § 37-1-166(g)(4)(A). In that case, DCS may reasonably forego efforts to reunify a family and immediately begin termination proceedings. ***In re Bernard T.***, 319 S.W.3d at 600. "However, in other circumstances, such as those typically implicated in Tenn. Code Ann. § 36-1-113(g)(1)–(3), the Department may demonstrate that the child's best interests will be served by terminating the parent's rights because the parent 'has failed to

effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonably appear possible.'" ***Id.*** (quoting Tenn. Code Ann. § 36-1-113(i)(2)).  "The decision to pursue a termination of parental rights on the grounds of abandonment, persistence of conditions, and substantial noncompliance generally invokes DCS's statutory duty to make reasonable efforts to facilitate the safe return of a child to the child's home."[4] ***In re Steven P.D.***, No. W2011-02489-COA-R3-PT, 2012 WL 3025151, at *9 (Tenn. Ct. App. July 25, 2012) (citing *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008)).  In this case, DCS alleged the existence of grounds (g)(1)-(3), and it acknowledges that it had an obligation to use reasonable efforts to make it possible for the child to return safely to Mother's home.  However, DCS contends that its efforts to assist Mother were more than reasonable.

"The General Assembly has characterized the reasonable efforts that the Department must make as 'the exercise of reasonable care and diligence by the [D]epartment to provide services related to meeting the needs of the child and the family.'" ***In re Bernard T.***, 319 S.W.3d at 600-601 (citing Tenn. Code Ann. § 37-1-166(g)(1)).  Our Supreme Court has further described DCS's obligation in this regard as follows:

> [T]he manner in which the Department renders services must be reasonable, not herculean. *In re Giorgianna H.*, 205 S.W.3d [508,] 519 [(Tenn. Ct. App. 2006)].  In addition, the Department is not required to shoulder the burden alone.  The parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required the removal of the children. *State, Dep't of Children's Servs. v. Estes (In re Q.E.)*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008); *In re Tiffany B.*, 228 S.W.3d [148,] 159 [(Tenn. Ct. App. 2007)].  The reasonableness of the Department's efforts should be decided on a case-by-case basis in light of the unique facts of the case. *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007).  Among the factors that may be used to evaluate the reasonableness of the Department's reunification efforts are: (1) the reasons for removing the child from the parent's custody, (2) the parent's physical and psychological abilities and

---

[4]  We note that "abandonment" is one of the "aggravated circumstances" listed in Tennessee Code Annotated section 36-1-102.  However, there has been no prior judicial finding of abandonment in this case. DCS is relieved of its obligation to make reasonable efforts "*only if* a court of competent jurisdiction has made a determination" that an aggravated circumstance, such as abandonment, or one of the other statutory requirements exists. ***In re A.R.***, No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *12 (Tenn. Ct. App. Dec. 13, 2007 (citing *In re B.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at *9 (Tenn. Ct. App. Dec. 6, 2007)).  The statute does not allow DCS to do nothing on a parent's case, providing no assistance, in the hopes that a court will later make a finding of abandonment that retroactively "forgives" its lack of efforts. ***Id.***; *see also* ***In re Steven P.D.***, 2012 WL 3025151, at *9.

deficits, (3) the resources available to the parent, (4) the parent's response to and cooperation with the Department's reunification efforts, (5) the resources reasonably available to the Department, (6) the duration and extent of the parent's efforts to address and remedy the conditions that required the removal of the child, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re J.C.D.*, 254 S.W.3d at 446; *In re Giorgianna H.*, 205 S.W.3d at 519.

*Id.* at 601 (footnotes omitted). It is clear, then, that "'[r]easonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.'" ***Estes***, 284 S.W.3d at 801 (quoting *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004)). However, DCS "does not have the sole obligation to remedy the conditions that required the removal of the children from their parents' custody." ***In re Giorgianna H.***, 205 S.W.3d at 518. When reunification of the family is a goal, the parents share responsibility for addressing the conditions that led to removal. ***Id.*** Reunification is a "two-way street," and the law does not require DCS to carry the entire burden of this goal. ***State Dep't of Children's Servs. v. S.M.D.***, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). If parents desire the return of their children, they must also make "reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." ***In re Giorgianna H.***, 205 S.W.3d at 519 (citing *State Dep't of Children's Servs. v. B.B.M.*, No. E2004-00491-COA-R3-PT, 2004 WL 2607769, at *7 (Tenn. Ct. App. Nov. 17, 2004); *In re C.M.M.*, 2004 WL 438326, at *7; *In re R.C.V.*, No. M2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002)).

In sum, DCS has the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meet Mother's needs to assist her with fulfilling her obligations under the permanency plans. *See* ***In re R.L.F.***, 278 S.W.3d at 316 (citing *In re Valentine*, 79 S.W.3d at 546; *In re C.M.M.*, 2004 WL 438326 at *8; Tenn. Code Ann. § 36-1-113(c)). Accordingly, we must determine whether DCS presented "sufficient evidence regarding its reunification efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances." ***In the Matter of J.L.E.***, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *12 (Tenn. Ct. App. June 30, 2005) (citing *In re C.M.M.*, 2004 WL 438326, at *8). Mother does not explain in her brief on appeal how DCS's efforts to assist her were allegedly deficient. Her brief lists as an issue whether the evidence at trial "showed that the Tennessee Department of Children's Services

failed to make reasonable effort to reunify child and parent." However, there is no corresponding argument section contained in her brief to explain the basis of this argument. Nevertheless, in light of the importance of Mother's rights at stake, we must consider the adequacy of DCS's efforts to reunite Mother and Josephine, along with the sufficiency of Mother's efforts to comply with the requirements of the permanency plan. When a termination proceeding involves grounds that implicate DCS's obligation to exert reasonable efforts to reunite a child and parent, "establishing that it made reasonable efforts . . . is an essential ingredient of the Department's case," and "the Department has the burden of proving its reasonable efforts even when the parent has not questioned the adequacy of its efforts." *In re C.M.M.*, 2004 WL 438326, at *7 (citing Tenn. Code Ann. § 37-1-166(b)).

Because the parental termination statute addresses "substantial noncompliance by the parent or guardian with *the statement of responsibilities* in a permanency plan," Tenn. Code Ann. § 36-1-113(g)(2) (emphasis added), we will begin by examining the numerous responsibilities set forth for Mother in the permanency plans in this case. The first "responsibility" listed for Mother was to visit with Josephine every other Thursday at the DCS office, and to provide diapers, wipes, a snack and drink, and toys during the visits. After Josephine was taken into DCS custody in April 2012, Mother attended visits with her every month, between one and three times per month, until Mother moved to Georgia in December 2012. Thereafter, she visited with Josephine once in January and once in February 2013, and then she had no more visits until the time of trial on July 2, 2013. DCS case manager Carol Davis testified that she had been assigned to Josephine's case since Josephine entered DCS custody in April 2012 at the age of nine months and that she had supervised all of Mother's visits with Josephine. Ms. Davis testified that Mother exhibited appropriate behavior during her visits and brought toys and snacks for Josephine.

From our review of the record, it appears to this Court that DCS made little effort to assist Mother with transportation for visits, although the permanency plan expressly required DCS to assist with transportation to and from visits if needed. Both permanency plans noted as a "concern" that Mother had self-reported transportation issues and "limited access to transportation." Mother did not have a driver's license, and she testified at trial that she generally walked to the visits, from her hotel room, or took the trolley. She testified that when she was unable to visit, it was due to transportation problems. She explained that when the tourist season ended, the trolley stopped running and cold weather set in. Mother testified that Josephine's foster father offered to drive her to and from some visits. Ms. Davis conceded that DCS only provided Mother with transportation for *one* visit. Ms. Davis also testified that she never offered transportation assistance to Mother after Mother moved to Georgia, stating, "[Mother] has not requested that or told me that that was an issue for her." However, we find this testimony suspect because Ms. Davis also testified that Mother missed a visit in early February, after she moved to Georgia, "due to transportation issues." Mother

testified at trial that in order to travel to Tennessee, she had to take time off from work, and have someone else take time off from work in order to drive her here, in addition to paying for a rental car, gasoline, and a hotel room. Interestingly, Ms. Davis was asked if it is possible for DCS to communicate with agencies in other states regarding a parent's case, and specifically, whether Ms. Davis could make a "referral" to the Georgia equivalent of DCS for assistance for Mother in complying with a permanency plan. Ms. Davis said, "If there were just some small things that they might could help with, that would be appropriate." Counsel for Mother asked if that would include "transportation or facilitating visits or something of that nature," and Ms. Davis responded affirmatively. Ms. Davis testified that the Georgia equivalent of DCS contacted *her* in April 2013 to inquire about the need for supervision if the child was ultimately placed with Mother, but aside from this issue, Ms. Davis said she did not request any services for Mother from the Georgia agency.

Despite DCS's lack of assistance with transportation, Mother did manage to regularly visit with Josephine at least once per month for the eight months that Josephine was in DCS custody prior to Mother's move to Georgia, and she visited two times after the move. As a result, we cannot say that Mother failed to substantially comply with the visitation requirement of the permanency plan.

Another "action step" listed for Mother in the permanency plan was to complete an alcohol and drug assessment and to follow all recommendations of the assessment. Mother actually completed *three* alcohol and drug assessments in the year after Josephine entered DCS custody, two at her own expense. In August 2012, Mother paid for an assessment by one of the providers that was listed as an acceptable option in the permanency plan.[5] The provider of this first assessment did not recommend alcohol treatment for Mother but did recommend that Mother attend domestic violence and parenting classes and continue with random drug screening.[6] In October 2012, Mother completed a second alcohol and drug assessment, at another facility, that was funded by the State. "Due to the risk of alcohol use," this assessment recommended intensive outpatient treatment, which Mother never completed. However, Ms. Davis acknowledged at trial that Mother was uninsured at the time of this

---

[5] Ms. Davis testified that she submitted a case service request for the State of Tennessee to pay for the alcohol and drug assessment for Mother, and the request was approved. When asked why Mother paid for this assessment herself, Ms. Davis explained, "A request had gone in and was approved in our system for June or July for her. It's my belief that she wanted to go ahead and do that on her own. I don't know if the provider had trouble locating her or what happened; but, at any rate, she went ahead and did that." DCS records indicate that Mother had called Ms. Davis in July 2012 "to request that her mental health and A&D assessments be started."

[6] These assessments are not included in the record. Our discussion of the recommendation from each assessment is based upon the testimony of Ms. Davis at trial.

recommendation. The October 2012 revised permanency plan required Mother to apply for TennCare and to submit her diagnosis and assessment recommendation for a determination of eligibility, but there is no evidence in the record to suggest that DCS made any attempt to assist Mother in this endeavor. Likewise, there is nothing to suggest that DCS made any other effort to assist Mother with obtaining the recommended intensive outpatient treatment. The permanency plan listed some names and addresses of providers "for Alcohol & Drug and Mental Health Assessments and Treatment" for both Mother and Father. However, as noted above, in order to constitute reasonable efforts by DCS, they must do "more than simply providing parents with a list of service providers and sending them on their way." *Estes*, 284 S.W.3d at 801; *see also In re A.R.*, 2007 WL 4357837, at *5 ("the Department must do more than merely provide a list of services to the parent, point them in the right direction, and rely on parents to facilitate their own rehabilitation").

Mother completed the third alcohol and drug assessment, again at her own expense, after she moved to Georgia. It appears that this assessment was completed in May 2013, just weeks before the July 2 termination hearing. It is unclear what agency recommended this assessment, as Ms. Davis simply testified that "[w]hen [Mother] went to Georgia, it's my understanding that they wouldn't accept her assessments that she had done here, that they wanted another assessment updated." As a result, Mother paid for a third assessment in Georgia. According to Mother, the third assessment did not recommend any type of intensive outpatient treatment, but according to Ms. Davis, the third assessment did recommend a psychological evaluation "due to emotional concerns."

Given that Mother completed three separate alcohol and drug assessments, two at her own expense, and considering DCS's failure to assist Mother with following the recommendations of these assessments, we find that Mother made significant efforts to comply with this aspect of the permanency plan.

The permanency plan also required Mother to attend AA meetings in order to maintain sobriety and to provide proof of her attendance to DCS. Mother testified at trial that she had been attending AA meetings in Georgia, usually once a week, at two local churches. She submitted a piece of paper that had numerous dates, locations, and signatures listed, and Mother claimed that this document evidenced her attendance at AA meetings. She explained that she had someone to sign the document at each meeting, and usually that person was her "sponsor." According to the document, Mother had attended three AA meetings each month during February, March, April, and May 2013. At trial, Ms. Davis acknowledged that Mother had informed her that she was attending AA meetings; however, Ms. Davis said she had asked Mother to fax her documentation of attendance and that Mother had not done so. Nevertheless, we find that Mother has made appreciable efforts to comply with this requirement of the permanency plan.

Another responsibility for Mother was to "submit to random drug screens as per DCS request." DCS records reflect that Mother submitted to random drug screens on May 9, May 31, June 14, and July 12, 2012, and she tested positive for THC on each of these occasions. Mother tested negative on August 9, September 12, and September 20. On November 29, Mother was asked to submit to a urine drug screen but stated that she was unable to give a urine sample. Although DCS apparently did not test Mother after that date, Mother testified at trial that she was being drug tested in conjunction with her AA meetings and that she was passing the tests. Thus, we cannot say that Mother failed to substantially comply with the permanency plan's requirement that she submit to random drug screens.

The permanency plans also required Mother to resolve her pending criminal charge for child neglect and to avoid incurring any new charges.[7] Mother was on probation for the child neglect charge throughout the duration of the lower court proceedings. The October 2012 revised permanency plan required Mother to cooperate with her probation officer and to complete the requirements of her probation, but it listed as a strength for Mother that she "has been compliant with probation requirements." Nevertheless, at the time of trial in July 2013, Mother acknowledged that she was no longer in compliance with the requirements of her probation due to her failure to pay court costs and her inability "to show up" due to "not being able to come up here [to Tennessee] as often[.]" Mother was asked if she was aware that she had been charged with violating the terms of her probation, and she responded that she was not aware of any such charge. However, the trial court's final order in this matter states, "The mother is also currently facing a violation of probation warrant, which will be served on her at the conclusion of the termination hearing." Accordingly, we find that Mother did fail to substantially comply with the permanency plan's requirement that she resolve her pending legal charge and complete the requirements of her probation.

The permanency plan required Mother to complete age-appropriate parenting classes, to submit proof of completion to DCS, and to demonstrate appropriate parenting during visits with Josephine. The record before us contains a letter from the foundation that provided the parenting classes that Mother attended, praising Mother's efforts, stating that she "has been easy to schedule home visits with and has kept all scheduled home visits," and that she "is easy to communicate with and participates in what's being discussed." Mother completed the parenting classes, which were funded by the State, in November of 2012, and Ms. Davis testified at trial that Mother exhibited appropriate behavior when she visited with Josephine. Therefore, Mother sufficiently complied with this requirement.

---

[7] The affidavits of reasonable efforts completed by Ms. Davis during the pendency of this case state that Mother was arrested for telephone harassment, but that the charge was ultimately dismissed, and she was arrested for public intoxication on another occasion. However, there was no testimony about these arrests during the trial.

The next requirement at issue is a mental health assessment. The permanency plan explicitly stated that "[Father] will attend a mental health intake and will follow all recommendations," but there was no explicit requirement that Mother complete a mental health assessment. Still, the permanency plan listed as an "action step" that, "If uninsured and unable to pay for assessments, [Ms. Davis] will submit a request for non-TennCare eligible A&D Assessment *and Mental Health* Assessment for [Mother]." (Emphasis added). This "action step" was listed inside a box with other obligations, such as attending AA classes and submitting to random drug screens, and the "responsible person(s)" listed were Mother and Ms. Davis.[8] The revised plan also stated that Mother "will apply for TennCare insurance at DHS and will submit her diagnosis/recommendations from A&D *and mental health* assessments for determination of eligibility." (Emphasis added). Regardless of the uncertainty that we perceive in the permanency plan, however, it is undisputed that Mother did complete a mental health assessment that was funded by the State. This assessment recommended that Mother complete a medication management evaluation and attend counseling. Again, however, Ms. Davis acknowledged that Mother did not have health insurance at the time of these recommendations. The permanency plan simply instructed Mother to apply for TennCare and to submit the recommendations for a determination of eligibility; however, there is no proof of any effort by DCS to help Mother with this process or to otherwise secure the needed counseling or medication management evaluation for

---

[8] This Court has previously criticized DCS for failing to include a section in a permanency plan clearly listing a parent's responsibilities. In *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App. Sept. 14, 2012), the permanency plan was "confusing" and set forth various "concerns," "desired outcomes," and "actions steps," like those in the permanency plan in this case, rather than a clear statement of responsibilities. We said:

> This omission is not a mere technicality. As we have noted in a previous case: "[T]he statute that sets out this ground for termination states that parental rights may be terminated where there is substantial noncompliance 'with the *statement of responsibilities'* in the permanency plan." *In re Askia K.B.*, [No. W2010–02496–COA–R3–PT], 2011 WL 4634241, at *9 [(Tenn. Ct. App. Oct. 7, 2011)] (quoting Tenn. Code Ann. § 36-1-113(g)(2)) (emphasis in original). See also *State of Tenn. Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *8; 2006 Tenn. App. LEXIS 608, at *23–24 (Tenn. Ct. App. Sept. 15, 2006) ("Tenn. Code Ann. § 36-1-113(g)(2) does not require substantial compliance with a permanency plan's '[d]esired outcome[s],' rather it requires substantial compliance with a plan's statement of responsibilities"). Moreover, the statement of responsibilities serves a substantive purpose. If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities. Thus, the absence of a clearly marked "statement of responsibilities" for Mother in the permanency plan is a significant problem. It is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one.

-16-

Mother. Ms. Davis testified that when Mother moved to Georgia she became ineligible for TennCare. Nevertheless, shortly after moving to Georgia, Mother provided Ms. Davis with a letter stating that she was beginning counseling with a doctor there. Mother later informed Ms. Davis that she had quit going to the counselor because she did not find the counselor's advice useful. At trial, Mother conceded that she only went to the counselor "once, maybe twice," explaining that she was paying for the counseling sessions herself, at a cost of $70 an hour, and that the counselor advised Mother to drink herbal tea and listen to soothing CDs before bed. Regarding the recommended medication management evaluation, Mother simply testified that she was not comfortable with "being put on drugs." To the extent that the permanency plans can be construed as requiring Mother to complete a mental health assessment and to comply with its recommendations, we find that she partially complied with this requirement and that DCS made little effort to assist Mother in her endeavor.

Next, the permanency plan required Mother to submit proof of legal income to DCS on a monthly basis, to provide proof of housing appropriate to meet family needs, and to show an ability to access reliable transportation. At trial, Ms. Davis acknowledged that Mother had attempted to obtain and maintain employment while she was residing in Tennessee. Mother's discovery responses indicated that she had worked at approximately nine different jobs from the time that Josephine entered custody until the date of the discovery responses, a period of roughly a year. Mother testified at trial about at least four jobs that she had held in Georgia. Mother worked mostly at hotels, cabin rental agencies, restaurants, grocery stores, and gas stations, often working two jobs at once.[9] Mother testified that the longest time period that she had been unemployed while Josephine had been in DCS custody was "[m]aybe two or three months," and that this period of unemployment was around the time that she moved to Georgia. While in Tennessee, Mother resided in motels and cabins.

DCS records indicate that Mother regularly reported to Ms. Davis regarding her employment situation. For example, in May 2012, Mother telephoned Ms. Davis and reported that she was living and working at a resort. In July, Mother called Ms. Davis and reported that she was working at a restaurant and living at a lodge. In September, Mother provided proof of her employment at a gas station in the form of a paystub, and she also submitted a renter's lease from the lodge. The October 2012 permanency plan listed as one of Mother's "strengths" that she was working two jobs – one at a gas station and one at a

_____

[9] It is unclear why Mother left her jobs in Tennessee. She testified that one employer in Georgia fired her after a week and a half when he found out about her criminal record. She testified that she quit another job at a Georgia restaurant after "a couple of days" because she determined it was not going to be "profitable" due to the fact that she did not have a license to serve alcohol or the funds to obtain it. At the time of trial, Mother was working part-time for a cleaning company that cleaned apartments.

lodge. In November 2012, Mother informed DCS that she quit her job at the gas station because she was moving to Sevierville and transportation would have been too difficult. Later that month, Mother reported moving out of other "housing" because of safety concerns, and she stated that she was living in a cabin and doing online work for the landlord. Ms. Davis testified that Mother also provided proof of her employment at two pizza restaurants at some point while she was living in Tennessee. Mother had informed Ms. Davis about two jobs she had after moving to Georgia, one at a restaurant and one at a grocery store. Mother reported her new address in Georgia just days after moving, on January 8, 2013. In April 2013, Mother contacted Ms. Davis and asked that the ICPC process be initiated for an evaluation of her home. Ms. Davis testified that Mother never provided her with a copy of her lease from her housing in Georgia, but Mother did produce a copy of the lease and photographs of the home at trial. Mother also testified that she had previously mailed a copy of the lease to Ms. Davis, although Ms. Davis denied receiving it. The ICPC evaluation had not been completed as of the date of trial, but Mother testified that she had been in contact with the Georgia equivalent of DCS and that the in-home evaluation was scheduled for the week after trial.

In contrast to Mother's efforts, we find no proof to suggest that DCS made *any* effort to assist Mother with housing or with employment issues. The permanency plans simply required Mother to submit proof of stable employment and housing, with no assistance, guidance, or instruction by DCS to help Mother attain these goals. Ms. Davis testified, in general, that there was nothing that Mother ever asked for that DCS did not provide for her. However, "[t]he Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not." *Estes*, 284 S.W.3d at 801. In light of DCS's failure to make *any* effort to assist Mother with housing or employment issues, we find that Mother's efforts to comply with each of these requirements were meaningful and significant, and that she did not substantially fail to comply with these requirements of the permanency plan.[10]

Finally, the permanency plans required Mother to "attend non-offender domestic assault classes to completion, to learn appropriate conflict resolution and how to keep herself safe in relationships."[11] DCS first referred Mother to a local community health facility, which recommended that she attend six one-on-one sessions over a period of six weeks. Mother began these sessions as directed, but approximately halfway through her completion

---

[10] There was no evidence presented regarding whether Mother failed to comply with the permanency plan's requirement that she submit a monthly budget to DCS, so we will not consider the issue.

[11] Mother testified at trial that she and Father had been separated for at least six months at the time of trial and that she no longer had contact with him.

of the six-week program, the facility closed. Ms. Davis then referred Mother to "Safe Space," which, according to Ms. Davis, provides support to victims of domestic violence. Mother testified at trial that "they put [her] in a home in Knoxville" with several other women, but that she left after about a week and a half because she was offered a job in Pigeon Forge for which she had previously applied, so she "came back and took the job and left Safe Space." Mother also testified that she felt she could do better on her own because the group home was in a part of town where it was dangerous to go outside at night, and the facility was filthy and rat-infested. Thus, Mother acknowledged at trial that she had "not completely" fulfilled the permanency plan's requirement that she attend non-offender domestic assault classes "to completion." Notably, however, there was no proof to suggest how long Safe Space recommended that Mother stay there. The permanency plan did not require Mother to move into a group home. The original plan only required her to complete "non-offender domestic assault classes," and Mother completed half of the recommended program before her classes were cancelled through no fault of her own. The revised plan required Mother to "work with Safe Space to learn appropriate conflict resolution and how to keep herself safe in relationships," and Mother moved into the group home in a nearby county. As such, we again find that Mother made legitimate strides to complete this requirement and that she did not fail to substantially comply with this portion of the permanency plan.

Considering the entire record before us, we find that the evidence presented did not clearly and convincingly establish that Mother failed to substantially comply with the terms and conditions of the permanency plans. Mother made substantial financial expenditures in an attempt to comply with the numerous requirements of the permanency plans, in spite of her limited financial resources, and she made legitimate attempts to comply with each requirement of the permanency plan. Although she was not fully successful with regard to every requirement, we cannot say that the overall degree of her noncompliance was substantial. Thus, the statutory ground of failure to substantially comply with a parenting plan as set forth in Tennessee Code Annotated § 36–1–113(g)(2) has not been established by the requisite proof, and we reverse the trial court's finding that this ground was proven.

We also note one other concern we have with DCS's efforts in this case. The revised permanency plan listed a goal target date of April 2013, which would have marked one year since Josephine entered DCS custody. It is undisputed that Mother called Ms. Davis in December 2012 to inquire as to whether a move to Georgia would affect her chances of gaining custody of Josephine, and Ms. Davis, by her own admission, told Mother that "she must live where she feels she can best find support and complete the action steps on her permanency plan." According to Ms. Davis, Mother informed her "that she just didn't have the support that she needed here and she was having a hard time making it here. She felt she could do better if she was back in Georgia near her family." Mother also conveyed to Ms.

Davis that she "felt confident that she could get in a better place if she moved and that she could handle meeting her Perm Plan requirements." In response, Ms. Davis told Mother to inform her when she felt she was stable in order for her home in Georgia to be evaluated through ICPC. When Mother moved shortly after this conversation, around December 29, DCS filed the petition to terminate Mother's parental rights almost immediately, on January 2. "Although we agree that the public policy of this State is to avoid leaving children in the limbo of foster care any longer than necessary, we also believe that parents must be given, as realistic under the specific facts of each case, a real opportunity to make adjustments to their lifestyle to regain custody of their children." *In re C.H.E.H.*, No. E2007-01863-COA-R3-PT, 2008 WL 465275, at *11 (Tenn. Ct. App. Feb. 21, 2008). Here, Mother contacted DCS and specifically inquired as to whether a move to Georgia would affect her chances of gaining custody of Josephine, and in response, Ms. Davis assured Mother that she should live where she felt she would have the most support. When Mother heeded that advice and moved, DCS immediately changed course and filed a petition to terminate Mother's parental rights, essentially giving up on Mother. If DCS intended to file a termination petition based upon Mother's decision to move, Ms. Davis should have provided Mother with that information when they discussed the possibility of her moving while Mother was still in Tennessee.

Based on the totality of the circumstances in this case, we find that DCS failed to present clear and convincing evidence that it made reasonable efforts to assist Mother and to reunify her with Josephine. Basically, DCS supervised Mother's visits with Josephine; it provided her with transportation to a single visit; it submitted the necessary requests for funding for Mother's parenting classes, alcohol and drug assessment, and mental health assessment; it provided Mother with the names of providers for domestic violence classes; and it administered Mother's drug screens. From the evidence before us, it appears that DCS failed to satisfy its responsibility of assisting Mother with transportation to and from visits when needed, despite her reports of transportation problems; it made no effort to help Mother obtain the intensive outpatient treatment recommended by the alcohol and drug assessment; it made no attempt to aid Mother with obtaining counseling or a medication management evaluation as recommended by the mental health assessment; it failed to assist Mother with the requirement that she apply for TennCare and submit her diagnoses for a determination of eligibility; it wholly failed to make an effort to assist Mother or even provide her with guidance concerning her unstable housing and her employment problem; and it made no attempt to communicate with the Georgia agency to request support services for Mother after she moved (aside from sending the request for the ICPC home study, which Mother specifically requested). In our view, there is no clear and convincing evidence that DCS exercised "reasonable care and diligence" to provide the services needed by Mother in order to assist her with accomplishing the requirements of the permanency plan. *In re Bernard T.*, 319 S.W.3d at 600-601 (citing Tenn. Code Ann. § 37-1-166(g)(1)). DCS simply failed

to present "sufficient evidence regarding its reunification efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances." *In the Matter of J.L.E.*, 2005 WL 1541862, at *12. The trial court's finding that DCS made reasonable efforts is hereby reversed.

## B.  Abandonment

The most frequently asserted ground for termination listed in the termination statute is abandonment. *In re Audrey S.*, 182 S.W.3d at 862. For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)-(v). Here, DCS alleged abandonment for failure to support and abandonment for failure to provide a suitable home, pursuant to the first two definitions of abandonment.

### 1.  Failure to Support

Tennessee Code Annotated section 36-1-102(1)(A)(i) defines abandonment, in pertinent part, as follows:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) . . . have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

For purposes of the statute, "'willfully failed to support' or 'willfully failed to make reasonable payments toward such child's support' means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "Token support" means that "the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A parent's "means" includes "both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d at 641 (citing *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 n. 24 (Tenn. Ct. App. June 3, 2003); *Black's Law Dictionary* 1070 (9th ed. 2009)).

A parent cannot be said to have abandoned a child when his or her failure to support is due to circumstances outside his control. *In re Adoption of Angela E.*, 402 S.W.3d at 640. Consequently, in order to prove the ground of abandonment for failure to support, the

petitioner must establish by clear and convincing evidence that the parent who failed to support "had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." **Id.** (citing *In re Audrey S.*, 182 S.W.3d at 864). Whether a parent failed to support a child is a question of fact; however, the issue of whether a parent's failure to support constitutes willful abandonment is a question of law, which we review de novo with no presumption of correctness. **Id.** (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

The trial court found that Mother was aware of her duty to support, that she "had the capacity to provide support and had no justifiable excuse for not paying support." It is true that Mother had been ordered to pay $100 per month in child support beginning in June 2012, and she never paid any amount toward child support while Josephine was in DCS custody, aside from toys or food that she brought to visits with Josephine. Mother also confirmed at trial that she was not disabled in a manner that would prevent her from working. However, there was little to no evidence presented at trial regarding Mother's income and expenses. The relevant time period for establishing Mother's willful failure to support is the four-month period prior to the filing of the termination petition on January 2, 2013. As previously noted, Mother worked for short periods at numerous jobs while Josephine was in DCS custody, and she sometimes worked two jobs at once. The October 2012 revised permanency plan listed as a "strength" for Mother that she was working two jobs. Mother provided DCS with a copy of a renter's lease in September 2012 indicating that she was paying rent of $175 per week, and in November, Mother reported that she was living in a cabin, paying rent of $500 per month. In December 2012, Mother reported that she had been ill for weeks and unable to afford her medications. She testified at trial that "money started running out" when it became cold outside and there were no tourists. Mother testified that her longest period of unemployment was a period of around two to three months after she moved to Georgia, which means, after the termination petition was filed.

Mother testified that no one was giving her financial assistance during these proceedings, and that in addition to the assessment and counseling expenses she incurred, she was required to pay for her rent, bills, transportation costs, food, and toiletries that were not covered by her food stamps. Mother also conceded that during "a lot of this" she was still involved with Father, and that he only worked "[e]very once in a while . . . doing the time share thing, but it wasn't really reliable," so Mother was the primary breadwinner. Mother testified that she spent "a lot" of money on the two assessments that she had performed at her own expense. Mother was asked to give "a rough estimate as to the total amount of finances [she had] expended during this case," and her estimate was over $2,000. Mother testified that her gross income in 2012 was $5,788, although she said that this figure did not include "tips for waitressing and stuff."

Even though it is undisputed that Mother did not pay any child support for Josephine during the relevant four-month period, we find that DCS failed to prove by clear and convincing evidence that Mother had the capacity to support Josephine and had no justifiable excuse for not doing so. *See **In re Adoption of Angela E.***, 402 S.W.3d at 640-41 (reversing a finding of willful failure to support where there was no evidence concerning a parent's monthly expenses, even though the parent was earning $150,000 annually). It was not enough for DCS to simply prove that Mother was not disabled during the relevant timeframe. Furthermore, DCS was required to prove that it made reasonable efforts to assist Mother in order to satisfy this ground for termination, and we have already concluded that DCS failed to meet its burden. Accordingly, we reverse the trial court's finding that grounds for termination existed based upon abandonment for failure to support.

### 2. Failure to Provide a Suitable Home

The next ground alleged by DCS was abandonment for failure to provide a suitable home. The relevant statutory definition of abandonment states:

(ii) The child has been removed from the home of the parent(s) . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). The trial court found that Josephine was removed from Mother's home and placed into DCS custody, and that the juvenile court had previously adjudicated Josephine dependent and neglected and found that it was reasonable for DCS to

make no effort to maintain the child in the home due to the circumstances. The trial court further found that DCS made reasonable efforts to assist Mother in establishing a suitable home for the child, and that Mother did not make any reasonable effort to provide a suitable home. Accordingly, the court concluded that grounds for termination existed.

In order to satisfy this definition of abandonment, we must be able to find by clear and convincing evidence that for a period of four months following Josephine's removal, DCS "made reasonable efforts to assist [Mother] to establish a suitable home for the child[.]" Tenn. Code Ann. § 36-1-102(a)(1)(A). DCS's efforts "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]" *Id.* From the record before us, we cannot conclude that DCS met its burden with respect to the ground of failure to provide a suitable home by clear and convincing evidence. Specifically, there is no evidence in the record to suggest that DCS made any effort to assist Mother with housing. The permanency plan simply noted that Mother was living in motel rooms, it required her to provide proof of stable housing "appropriate to meet family needs," and it stated that DCS would evaluate Mother's home for safety and space prior to any trial home placement. Again, "its efforts do not need to be 'Herculean,' [but] DCS is required to use its 'superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.'" *In re Isobel V.O.*, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8 (Tenn. Ct. App. W.S. Nov. 8, 2012) (citing *Estes*, 284 S.W.3d at 801). In *Isobel V.O.*, for example, we held that DCS failed to prove by clear and convincing evidence that it used reasonable efforts to assist parents with establishing a suitable home where the only effort DCS made with respect to housing was to provide them with a list of possible housing options. *Id.* We have likewise found a lack of clear and convincing evidence of abandonment for failure to provide a suitable home where DCS "offered no evidence of efforts it made to help Mother obtain suitable housing at any time." *In re C.H.E.H.*, No. E2007-01863-COA-R3-PT, 2008 WL 465275, at *11 (Tenn. Ct. App. Feb. 21, 2008); *see also In re K.E.R.*, No. M2006-00255-COA-R3-PT, 2006 WL 2252746, at *7 (Tenn. Ct. App. Aug. 3, 2006) (reversing termination on this ground where it was "unclear whether the Department made any efforts to help Mother procure housing" during the relevant timeframe).

Here, we simply cannot say that DCS presented clear and convincing evidence that it made reasonable efforts to assist Mother in establishing a suitable home.[12] Therefore, we

---

[12] We recognize that "abandonment by failure to provide a suitable home is not limited to the parents' physical home; a home may be rendered unsafe and unsuitable by the conduct of its occupants." *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. W.S. June 16, (continued...)

must conclude that the record does not contain sufficient evidence to establish this ground for termination, and the trial court's finding on the ground of abandonment for failure to provide a suitable home must be reversed.

### C.  Persistent Conditions

Finally, we must consider the ground for termination that is commonly referred to as "persistence of conditions," defined in Tennessee Code Annotated section 36-1-113(g)(3) as follows:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008). In cases involving the "persistence of conditions" ground, DCS is not required to prove that a parent-child relationship cannot be salvaged, nor is DCS required to show that a parent is "currently harmful" to a child's safety or future emotional stability. *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). The termination of parental rights statutes recognize a child's need for a permanent, stable environment. *Id.* Accordingly, the question is the likelihood that the child

---

[12](...continued)
2011) (citing *In re Morgan S.*, No. E2009–00318–COA–R3–PT, 2010 WL 520972, at *10 (Tenn. Ct. App. Feb.12, 2010)). Here, however, DCS failed to make an effort to assist Mother with obtaining even a suitable physical home.

can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with weekly visits with the parent. *Id.* A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care. *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). Where efforts to provide help to improve parenting abilities have been offered over a long period of time and have proved ineffective, "the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.*

As we pointed out earlier, however, "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518 (citing *In re C.M.M.*, 2004 WL 438326, at *7). Therefore, in order to establish this ground for termination, "the Department must not only establish each of the elements in Tenn. Code Ann. § 36–1–113(g)(3)(A), it must also establish by clear and convincing evidence that it made reasonable efforts to reunite the family and that these efforts were to no avail." *Id.* (citing *In re C.M.M.*, 2004 WL 438326, at *7 n. 27, *8).

We have already determined that DCS did not make reasonable efforts to reunite Mother and Josephine. Therefore, we reverse the trial court's finding that the ground of persistent conditions was proven by clear and convincing evidence.

## V.  CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby reversed and remanded for such other proceedings as may be necessary. Costs of this appeal are taxed to the appellee, the Tennessee Department of Children's Services, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

-26-